# UNITED STATES DISTRICT COURT

for the

9th Circuit

District of Arizona

Phoenix Division

FILED ___ LODGED
___ RECEIVED ___ COPY

APR 2 9 2019

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

Richard C. Carrier, Ph.D.
*Plaintiff*

-v-

Amy Elizabeth Frank
*Defendant*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.   **CV-19-02719-PHX-JJT**

Jury Trial:   √ Yes    No

## COMPLAINT FOR A CIVIL CASE

### I.   The Parties to This Complaint

#### A.   The Plaintiff

Here petitioning *pro se* is Richard C. Carrier, Ph.D., residing at

134 West Tulane Rd., Apt. B, Columbus, Ohio 43202-1943 (Franklin County)

Phone (mobile): (510) 932-9536
Email: richard.carrier@icloud.com

**B.      The Defendant**

Amy Elizabeth Frank, residing at

7025 South 42nd Street, Phoenix, AZ 85042-8908 (Maricopa County)

## II.      Basis for Jurisdiction

1. This Court enjoys subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because the Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

2. This Court enjoys personal jurisdiction over the Defendant pursuant to 28 U.S.C. § 1391(b)(1) because Arizona is the judicial district in which the Defendant resides.

3. This Court enjoys venue under 28 U.S.C. § 1391(b)(2) because all or a substantial portion of the events that gave rise to Plaintiff's claims accrued within the State of Arizona, including Defendant's publication and republication of the defamatory falsehoods in and from the district.

## III.      Statement of Claim

4. Plaintiff, Dr. Richard Carrier (hereinafter "Dr. Carrier" or "Plaintiff"), is an author and public speaker, a Ph.D. in the history of philosophy from Columbia University, a baccalaureate of the University of California Berkeley, and author of numerous scholarly books and articles published by reputable publishing houses, including, *Sense and Goodness Without God* (2005), *Not the Impossible Faith* (2009), *Why I Am Not a Christian* (2011), *Proving History* (2012), *Hitler Homer Bible Christ* (2014), *On the Historicity of Jesus* (2014), *Science Education in the Early Roman Empire* (2016), and *The Scientist in the Early Roman Empire* (2017). Dr. Carrier has authored chapters in many other books and articles in magazines and academic journals, and on his namesake blog. Dr. Carrier lectures and teaches worldwide. Dr. Carrier has been a resident of the State of Ohio since May of 2016.

5. Defendant, **Amy Frank** (hereinafter "Frank" or "Defendant"), formerly Amy Skiba, is the former president of the Arizona State University chapter of the Secular Student Alliance and resides in Arizona.

6. Defendant is author of a false and defamatory June 15, 2016 Facebook® post, and a July 30, 2016 GoFundMe® campaign on which she published false, defamatory, and outrageous allegations while residing in Arizona.

7. The number of broadband subscribers in the United States with access to Defendant's statements is more than 100 million according to the Organization of Economic Cooperation and Development ("OECD"). *Total Fixed and Wireless Broadband Subscriptions by Country* (Dec. 2015), available at http://www.oecd.org/internet/broadband/oecdbroadbandportal.htm (last visited August 11, 2016). The number of broadband subscribers in other English speaking nations with access to Defendant's statements, according to the OECD, is as follows: UK 24.65 million, Canada 13 million, Australia 6.76 million, New Zealand 1.47 million, and Ireland 1.3 million. *Id.*

## CASE HISTORY

8. Defendant's defamatory statements initiated a series of other parties publishing further defamation of the Plaintiff, causing Plaintiff to file a multi-count suit against all parties, including Defendant, on September 20, 2016, in the United States District Court, Southern District of Ohio, Eastern Division (*Richard Carrier v. FreethoughtBlogs Network et al.*, hereafter *Carrier v. FreeThought Blogs*; Case Number 2:16-cv-00906, judge Michael H. Watson and Magistrate Judge Deavers presiding).

9. Previous to that action, on July 6, 2016, Dr. Carrier, by and through counsel, sent to Defendant Frank a cease and desist letter by Certified U.S. Mail. Among other demands, Dr. Carrier insisted on a full written retraction (*Carrier v. FreethoughtBlogs*, Complaint, Dkt. 1, Exhibit 9; received on July 9, Ibid., Exhibit 15). In response to which Defendant republished and expanded her defamation of Plaintiff. Subsequent to which Plaintiff sued the Defendant.

10. Through common counsel the defense in *Carrier v. FreethoughtBlogs* then filed a motion to dismiss for lack of personal jurisdiction in December of 2016, alleging that Ohio was an improper venue for Plaintiff's action. This motion and others were contested in court through an arduous series of motions and briefs until the Ohio court ruled in favor of the defense, but without prejudice, instructing Plaintiff to re-file in another state (*Carrier v. FreethoughtBlogs*, Decision & Entry, Docket No. 43, issued November 14 of 2018).

11. Plaintiff had filed suit against the Defendant by September 20, 2016, within four months after the initial defamation was published, which is within the statute of limitations for both Ohio and Arizona. Plaintiff also filed a motion in Ohio court to toll the statute of limitations on 13 June of 2017, which is less than one year after the initial defamation was published, which is also within the statute of limitations for both Ohio and Arizona. Which motion the Ohio court "denied without prejudice…as moot" (Ibid., p. 5), instructing Plaintiff to re-file later in an appropriate jurisdiction and address therein the objections to tolling the statute that were stated in Defense's original Brief in Opposition to that motion.

12. Plaintiff has acted accordingly and is so doing. The requisite response to opposing a tolling of the statute in Arizona is provided herein, after the statement of facts in this case.

## STATEMENT OF FACTS

13. The Plaintiff adopts, re-alleges, and incorporates by reference all allegations of the foregoing Paragraphs, as if they were set forth in full herein and further alleges the following matters.

14. Through and as a result of his accomplishments in a career spanning more than two decades, Dr. Carrier has become well known to the public throughout the United States and the world as a professional writer, lecturer, and teacher, and has created for himself a unique public personality and image; and his image, likeness and public personality have become commercially valuable commodities.

15. Dr. Carrier's current occupation is that of author, co-author, lecturer, teacher, debater, and blogger, and he continues to write books professionally and tour the United States and beyond to promote and sell his work. He pursued this occupation part-time for decades, developing a fan base and revenue and reputation as an honest and reliable authority, and has pursued this occupation full-time since January of 2015.

16. Dr. Carrier has also been and wishes to remain an active political, social, and philosophical commentator, and an active professional scholar who participates in academic societies, conferences, and research, for all of which his reputation is a valuable asset.

17. Dr. Carrier has had professional relationships and valid ongoing business expectancies with various reputable publishing houses and co-authors.

18. Dr. Carrier has had professional relationships and valid ongoing business expectancies with organizations that include: the Secular Student Alliance (SSA), and the SSA's hundreds of campus affiliates, Camp Quest, and its many regional affiliates, the Center for Inquiry, the Freedom From Religion Foundation, the United Coalition of Reason, American Atheists, Atheist Alliance of America, the American Humanist Association, and the Council for Secular Humanism, and hundreds of other secular and religious community groups across the United States and beyond, which include organizations of humanists, atheists, and skeptics, as well as ethical societies, and churches and religious organizations (who have hired him for interfaith work). All of which have been his principal source of speaking and direct sales income.

19. In January of 2015 Dr. Carrier also became an outspoken polyamorist and advocate for polyamory, or "ethical non-monogamy," endorsing and ethically pursuing open and multiple relationships. He has for many years been an outspoken advocate for ethical conduct in the treatment of women and men, and an ardent defender of responsible, sex-positive feminism, and ethical non-monogamy, and as a crucial part of that advocacy, he has himself always respected anyone's stated boundaries, and would never subject anyone to actual harassment of any kind.

### *Defendant's False and Defamatory Statements*

20. On June 15, 2016, Defendant published a false and defamatory social media post on Facebook®, alleging a 2015 incident of sexual assault and sexual harassment (the "Facebook Post"). Ms. Frank's post reads, in its entirety, as follows:

"Amy Frank June 15

"Parents, and younger people who may graciously volunteer for Camp Quest, a summer camp for kids:

"Richard Carrier, the man who sexually harassed me and touched me a year ago after speaking at ASU is now an official employee of this organization. Campus Quest and the Secular Student Alliance are partners, and fully aware of what transpired last year. I'm not even close to being his only victim, and there are even more victims of other speakers of the SSA. Want to know why he continues to be involved after being banned from being an SSA speaker? He is dating the wife of the Executive Director of the Secular Student Alliance. This woman is the head of Camp Quest.

"Corrupt people continue to destroy what could be wonderful organizations. I am officially BOYCOTTING the national Secular Student Alliance until their leadership is completely dismantled. Students deserve to have an organization capable of handling sexual harassment and assault, with no conflicts of interest. Not only is abuse fairly common at SSA events, but the organization itself goes out of their way to undermine the reports of its very own members' trauma.

"I've held my tongue far too long. No more sweeping this shit under the rug. Time to own the fuck up and face the music. The victims have had enough.

"If you've been a victim of harassment or assault at any SSA-sponsored event, please feel free to contact me. I will keep your name confidential.

#secularstudentalliance #sexualassault #sexualharassment #nomeansno #resign"

21. A true and correct copy of Ms. Frank's June 15, 2016 post is attached hereto marked **Exhibit 1**.

22. False and defamatory statements attached hereto as Exhibit 1 include, but are not limited to, the assertion that Richard Carrier was "banned from being an SSA speaker," that Ms. Frank was "not even close to being his only victim," that the Plaintiff "sexually harassed" her and "touched" her, including the allegation of sexual assault with the hashtag "#sexualassault," and the allegation of corruption involving Camp Quest and the Secular Student Alliance. That Richard Carrier had ever become "an official employee" of Camp Quest was and is also false, but an explicable error on the part of the Defendant and is not here being alleged defamatory.

23. As of July 2016, before it was removed from public view, Frank's post garnered over 100 Facebook® reactions and had generated numerous online articles by other parties publicizing her statements.

24. On July 6, 2016, Dr. Carrier, by and through counsel, sent to Ms. Frank a cease and desist letter by Certified U.S. Mail (as set forth above). Among other demands, Dr. Carrier insisted on a full written retraction.

25. Subsequent to receiving Dr. Carrier's cease and desist letter, Defendant Frank responded by starting a GoFundMe® campaign (the "GoFundMe Post"), on which she published a verbatim copy of the Plaintiff's letter, and posted additional false, defamatory, and outrageous allegations, on July 30, 2016. That post read, in its entirety, as follows:

> "Amy Frank is a neurobiology student at Arizona State University. Last year, she helped host a campus event, featuring Dr. Richard Carrier. Soon after the event, Amy reported that Dr. Carrier made several romantic and sexual advances toward her. In her own words."

>> "During the course of the night, Dr. Carrier brought up having sexual relations with my husband and I. He told me that he was disappointed that my husband wouldn't let me just have sex with him, but that'd he'd be willing to have my husband involved. My husband quickly fell asleep after arriving [at a friend's] house. Dr. Carrier kept whispering to me how my husband wasn't awake and wouldn't be for a while (insinuating that he wouldn't know if we did something inappropriate)...He repeatedly pointed out the fact that'd he had a vasectomy and how it much it increased his sexual performance.

>> "Dr. Carrier made me feel very uncomfortable. He is very charming so he did not scare me at first, but he got increasingly creepy throughout the night. He is very obsessed with his sex life and has no problem sharing it with students, and trying to involve them in it. I would never feel okay going to another speaking event of his, or being in a private setting with him again. I think it would be unfair to his future female audiences to not say something about his actions. If something happened, I would feel partially at fault for not reporting his behavior."

> "In June of this year, Amy Frank decided to publicly break the silence regarding her experience of being sexually harassed. We could not be more proud of her for taking such a brave step and for being an example to women in the same situation.

> "Unfortunately, following her announcement, Amy learned she was facing a defamation lawsuit for coming forward with her story (view the letter here). As her friends, we created this campaign to fund her legal defense against the man who harassed her and is now suing her. It's important that we support women taking a stand against sexual harassment. It is equally important to stand in solidarity with women when they need our help.

> "We will be bringing a bagged lunch to work and donating the price of lunch ($10) to Amy's defense. We hope you will join us.

> "If you are unable to donate please share and post this campaign on all of your social media. Amy should not have to be put under financial strain for voicing her experience. Every bit goes a long way.

> "Help spread the word!"

26. A true and correct copy of Frank's GoFundMe® campaign is attached hereto marked **Exhibit 2**.

27. In her GoFundMe® campaign, Frank affirmed that her defamatory statements are assertions of objective fact, not mere opinion nor ordinary rhetoric. She also therein made new defamatory allegations. *Id.*

28. As of April 2019 this "GoFundMe" campaign page had raised over $1,800 U.S. dollars from 48 donors.

29. False and defamatory statements attached hereto as Exhibit 2 include, but are not limited to, the assertion that Dr. Carrier asked to have sex with the Defendant (he did not) and that he would be disappointed by sharing her with her husband (many will testify that in fact Dr. Carrier prefers that arrangement and therefore can never have said that to her, demonstrating this entire conversation about sex is a fabrication of Frank), as well as that he "kept whispering" to Ms. Frank (multiple witnesses will testify this never happened, e.g. "Affidavit of Spencer Hawkins," attached hereto marked **Exhibit 4**, which is Exhibit 24 of the original Complaint in *Carrier v. FreeThought Blogs*), particularly with specific lascivious statements that were never said to her (such as regarding the Plaintiff's vasectomy), and the allegation that he did so "repeatedly."

30. The quoted passages attached hereto as Exhibits 1 and 2 are defamatory, intentionally reckless and malicious.

### *Evidence of Actual Malice*

31. On information and belief Ms. Frank previously lodged a complaint with the Secular Student Alliance, in or around May 2015, alleging a violation of the SSA's policy against fraternization (i.e. expressing romantic interest while Dr. Carrier was a member of the SSA Speaker's Bureau) but not then alleging a violation of the SSA's separate and distinct policy against sexual harassment.

32. On information and belief, Ms. Frank's May 2015 complaint bears no factual resemblance to her subsequent, false statements attached hereto as Exhibits 1 and 2.

33. Upon being informed of that complaint soon after in 2015, Dr. Carrier agreed with the SSA that he was not in compliance with their fraternization policy, and has admitted to respectfully expressing romantic interest in the Defendant at a private party (see, "Affidavit of Richard Carrier Concerning Amy Frank," attached hereto marked **Exhibit 3**). But he did not address any other conduct alleged, as at that time no allegation of touching or harassment had been made to be denied. No investigation was therefore called for.

34. At all times relevant, violation of the SSA fraternization policy did not incur a ban on speaking for SSA groups and at SSA events, and evidence will show the Plaintiff was not so banned but in fact explicitly allowed by the SSA to continue such speaking, and continued to do so. He was only removed from the SSA Speaker's Bureau (in or around August 2015) and with his full approval (as speakers not on that bureau were not subject to the fraternization policy), which only deprived him of limited promotional, logistical, and financial support. He was not banned from speaking. Evidence will also show that the Defendant knew this, including that this was the actual policy, in contradiction to her false assertion to the contrary in June of 2016.

35. After the Defendant published her defamatory statement in June of 2016, for the first time alleging actual harassment and assault, the SSA initiated and by the conclusion of 2016 completed a formal investigation of her new claims. Evidence will show that that investigation did not conclude Dr. Carrier had violated the SSA's policy against sexual harassment and only re-affirmed that he had violated their fraternization policy, as he had already admitted to. The SSA publicly announced that no further action was required.

36. As Dr. Carrier did not "victimize" Ms. Frank, certainly not in the manner she alleges, nor anyone else, she cannot honestly claim to know she was "not even close to being his only victim." And as even an official investigation did not find that he "sexually harassed" her or "touched" her (much less "assaulted" her), and even her original complaint to the SSA made no such claims, and even her subsequent addition of her new defamatory claims in July peculiarly excluded any reference to such conduct, and as the testimony of witnesses present will agree no such touching or harassment occurred, it can be shown that the Defendant must have known her claims to such are false. And since Dr. Carrier's treatment by the SSA was fully in accord with SSA policy, as evidence will show the Defendant knew, the evidence thus shows the Defendant likewise must have known her allegation of corruption was also false.

37. Evidence will also show Ms. Frank made many false statements, directly and through counsel, in subsequent legal filings, establishing a pattern of dishonesty and disregard of the truth.

38. Defendant's defamatory statements above have been reported, republished, repeated, and/or re-broadcast throughout the United States and nationwide, via social media, blogs, and other media, and continue to be republished, repeated, and re-broadcast.

39. As of August 15, 2016, a Google® Internet search using the term Richard Carrier produced 48,500,000 results, including news articles and blogs that repeat these defamatory statements and accusations, and otherwise report and comment on them.

40. At the time they were written, Defendant knew her statements to be false or were made with reckless disregard as to truth or falsity.

41. By falsely claiming, without privilege, that Dr. Carrier committed sexual assault and sexual harassment as well as other corrupt and lascivious acts, the Defendant intended to inflict a vicious, deliberate, and calculated attack on Dr. Carrier's character, reputation, and professional standing, and to turn the academic and skeptic communities against Dr. Carrier, and to cause them to have contempt, scorn, disgust, and hatred for him, and to hold him in the lowest possible regard.

42. The Defendant's statements stigmatize Dr. Carrier as guilty of serious criminal offenses involving moral turpitude, allege behavior incompatible with the proper conduct of his business and trade, and injure his professional standing.

43. At the time her intentional false statements were made, the Defendant knew of Dr. Carrier's valid business expectancies described above.

## TOLLING THE STATUTE OF LIMITATIONS IN ARIZONA

44. Though Plaintiff is filing a claim of defamation in Arizona after the statute of limitations in Arizona has run, law and precedent provide exceptions to be made, by an "equitable tolling" of the statute, and thus extension of that required time, when a plaintiff has nevertheless followed due process in a timely manner.

45. Plaintiff's prior counsel has already summarized the law and basis warranting such relief in Plaintiff's case (*Carrier v. FreethoughtBlogs*, Docket 31, "Motion for Miscellaneous Relief"), establishing the Plaintiff meets all the conditions normally warranting equitable tolling (per *Dixon v. Gonzales*, 481 F.3d 324, 331), including satisfying the Ohio saving statute (Ohio Revised Code § 2305.19(A) per http://codes.ohio.gov/orc/2305.19), which allows Plaintiff to re-file a claim dismissed without prejudice within one year of its dismissal (a plaintiff "may commence a new action within one year after the date of…the plaintiff's failure otherwise than upon the merits," *Ibid*.).

46. Ohio statute would therefore allow Plaintiff to re-file his claim within one year of 14 November 2018, the date of the Federal Court ruling on Plaintiff's jurisdiction (*Carrier v. FreethoughtBlogs*, Docket 43) resulting in "the plaintiff's failure otherwise than upon the merits." As Plaintiff's action began in and was dismissed by a Federal court in Ohio (and not a State court), the Ohio statute establishing Plaintiff's right to re-file in an acceptable jurisdiction should reasonably apply even in the Federal court of another state if that other state has an overlapping statute conferring the same right; particularly given Rule 3 of the Federal Rules of Civil Procedure, which states that "a civil action is commenced by filing a complaint with the court."

47. Arizona law now holds that "if an action is commenced within the time limited for the action, and the action is terminated in any manner other than by abatement, voluntary dismissal, dismissal for lack of prosecution or a final judgment on the merits, the plaintiff…may commence a new action for the same cause after the expiration of the time so limited and within six months after such termination" (AZ Rev Stat § 12-504). Termination of Plaintiff's case in Federal court occurred on 14 November of 2018, granting the Plaintiff until at least May 13 of 2019 to re-file in Arizona. Plaintiff has satisfied that requirement.

48. Even when Arizona lacked a saving statute, it was decided in *Hosogai v. Kadota*, 145 Ariz. 227 (1985), 700 P.2d 1327, that equitable tolling should be permitted in Arizona when a plaintiff meets three stated conditions, "(1) timely notice to the defendant in filing the first claim; (2) lack of prejudice to the defendant in gathering evidence to defend against the second claim; [and] (3) reasonable and good faith conduct by the plaintiff in prosecuting the first action and diligence in filing the second action." Plaintiff has here met all three conditions.

49. Defense's opposing brief to tolling the statute (*Carrier v. FreethoughtBlogs*, Docket 32, "Defendants' Opposition to Plaintiff's Motion to Apply the Doctrine of Prospective Equitable Tolling") stated no legally valid reasoning for not tolling the statute of limitations, whether in Ohio or Arizona.

50. It is in the interests of justice that a Plaintiff have a proper venue for the pursuit of valid claims; the Plaintiff both notified Defendant of his intent to sue and filed suit in a timely manner as would have satisfied the requirements of law in Ohio or Arizona; throughout the adjudication of the filing in Ohio Defendant was given ample notice and opportunity to gather evidence for the case; and Plaintiff made good-faith arguments for the appropriateness of a single Ohio venue for a lawsuit encompassing defendants across multiple states targeting a plaintiff in Ohio (see briefs in opposition to the motion to dismiss for lack of jurisdiction, *Carrier v. FreethoughtBlogs*, Docket 17 & 27).

51. Other questions of law or fact are beside the point whether those questions of law or fact deserve review in a proper venue. They therefore cannot themselves be legal grounds for denying the Plaintiff an equitable tolling of the statute of limitations for the very purpose of having those questions of law and fact adjudicated.

52. Plaintiff filed suit against the Defendant in Federal Court within the 1 year required by Arizona statute (Ariz. Rev. Stat. 12-541(1)) and has now re-filed that claim within the 6-months required by Arizona statute (AZ Rev Stat § 12-504).

53. No aspect of his case was found by any court to be conducted in bad faith. Consequently no "bad faith" argument can sustain an objection to continuing a case already begun in a timely manner in Ohio now in Arizona as required by law and judicial instruction. Nor has any "abuse of discretion" been demonstrated. Nor can any allegation of negligence prevail, as the Plaintiff has been anything but negligent in adherence to established procedure in this matter. Plaintiff has met all the required and expected conditions meriting a tolling of the statute, so that the case begun in Ohio may now be continued in Arizona as instructed.

54. In their opposing brief, Defense counsel cited several cases as if such cases argued in favor of disallowing a tolling of the statute in Plaintiff's case. None support any such conclusion. Neither *Archer v. Sullivan County*, 1997, nor *Cada v. Baxter Healthcare*, 1990, establish any grounds for declaring "promiscuous" a tolling of the statute in the present case. And *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 86, 96 (1990) explicitly states "Federal courts have typically extended equitable relief only sparingly in suits against private litigants," and yet "allowing tolling where the claimant has actively pursued his judicial remedies by filing a defective pleading," which is precisely the circumstance of the Plaintiff.

55. Accordingly, Plaintiff should enjoy a trial of the facts in this pending case, now in the proper venue, which according to judicial instruction is Arizona.

## IV.    Relief

Plaintiff appeals for relief as follows…

**COUNT ONE**
**DEFAMATION PER SE**

56. The Plaintiff adopts, re-alleges, and incorporates by reference all allegations of the foregoing Paragraphs, as if they were set forth in full herein and further alleges the following matters.

57. Defendant's demonstrably false statements, without privilege, impute to the Plaintiff serious criminal and moral offenses involving moral turpitude. The publication and republication of their statements of and concerning Dr. Carrier proximately caused general and special damages to the Plaintiff.

58. Defendant knew, anticipated, foresaw, and intended that their statements, with actual malice, made either with knowledge that they were false, or with reckless disregard of whether they were false or not, would be read by persons throughout the United States and the world and would damage the personal and professional reputation of the Plaintiff.

59. The Defendant's statements here identified as the "Facebook Post" and "GoFundMe Post" have adversely affected the Plaintiff's business and profession and personal life, including but not limited to his scholarly credibility, speaking, teaching, writing, and publishing opportunities, book sales, and blog income, and social and romantic life, and caused psychological and emotional trauma and suffering which is continuing.

### COUNT TWO
### DEFAMATION PER QUOD

60. The Plaintiff adopts, re-alleges, and incorporates by reference all allegations of the foregoing Paragraphs, as if they were set forth in full herein and further alleges the following matters.

61. Defendant's demonstrably false statements, without privilege, impute to the Plaintiff behavior incompatible with the proper conduct of his business and trade, and injure his professional standing.

62. Defendant's statements referred to herein have caused, are causing, and will cause the Plaintiff to suffer injury to his professional standing, to his reputation, and good name; and, Defendant's statements have held and will continue to hold the Plaintiff up to public scandal and ridicule.

63. Defendant's statements of and concerning Dr. Carrier were made with actual malice, made either with knowledge that they were false, or with reckless disregard of whether they were false or not, calculated to expose the Plaintiff to public scorn, hatred, and ridicule.

64. By such published statements, Defendant did injure the Plaintiff's reputation within his business and professional circles nationally and worldwide. The publication of the statements proximately caused general and special damages to the Plaintiff, adversely impacted the Plaintiff's scholarly credibility and professional standing, and opportunities for writing, teaching, speaking, book sales, and blog income, and caused the Plaintiff emotional and psychological trauma and suffering which is continuing.

### COUNT THREE
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

65. The Plaintiff adopts, re-alleges, and incorporates by reference all allegations of the foregoing Paragraphs, as if they were set forth in full herein and further alleges the following matters.

66. At all times herein, Defendant acted intentionally and unreasonably in publishing and republishing false statements in the "Facebook Post" and "GoFundMe Post," maliciously, with hate, spite, or ill will toward Dr. Carrier, or with such reckless disregard of whether they were false or not, when Defendant knew or should have known that the Plaintiff's emotional distress would likely result.

67. Notwithstanding the Plaintiff's requests that Defendant cease and desist immediately from their publishing of those statements, Defendant failed and refused to do so.

68. Defendant's conduct was intentional and malicious, and done for the purpose of causing, or was known by Defendant to likely cause the Plaintiff humiliation and embarrassment, mental anguish, damage to his reputation and career, and severe emotional distress, and was done with wanton and reckless disregard for the consequences to the Plaintiff.

69. As a proximate result of the aforementioned wrongful conduct, the Plaintiff has suffered substantial monetary damages, including damages to his personal and professional reputation and career, and substantial emotional distress, anxiety, and worry.

70. Unless and until enjoined and restrained by order of this Court, Defendant's continued acts will cause the Plaintiff severe and irreparable injury which cannot adequately be compensated by monetary damages. By reason of the foregoing, the Plaintiff is entitled to preliminary and permanent injunctive relief enjoining the publication and republication of the false and defamatory publications herein described.

## COUNT FOUR
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

71. The Plaintiff adopts, re-alleges, and incorporates by reference all allegations of the foregoing Paragraphs, as if they were set forth in full herein and further alleges the following matters.

72. At all times herein, Defendant acted negligently and unreasonably in publishing and republishing false statements in the "Facebook Post" and "GoFundMe Post," maliciously, with hate, spite, or ill will toward Dr. Carrier, or with reckless disregard of whether they were false or not. In so doing, Defendant acted beyond reasonable bounds of decency, and negligently inflicted emotional distress upon the Plaintiff.

73. Notwithstanding the Plaintiff's requests that Defendant cease and desist immediately from their publishing of those statements, Defendant failed and refused to do so.

74. Defendant's conduct was negligent, and proximately caused the Plaintiff to suffer substantial humiliation and embarrassment, mental anguish, damage to his reputation and career, and severe emotional distress, and was done with wanton and reckless disregard for the consequences to the Plaintiff.

75. As a proximate result of the aforementioned wrongful conduct, the Plaintiff has suffered substantial monetary damages, including damages to his personal and professional reputation and career, and substantial emotional distress, anxiety, and worry.

76. Unless and until enjoined and restrained by order of this Court, Defendant's continued acts will cause the Plaintiff severe and irreparable injury which cannot adequately be compensated by monetary damages. By reason of the foregoing, the Plaintiff is entitled to preliminary and permanent injunctive relief enjoining the publication and republication of the false and defamatory publications herein described.

---

WHEREFORE, on the preceding basis, the Plaintiff, Richard Carrier, Ph.D., respectfully prays that the Court:

A. Assume jurisdiction of this case;

B. For Count I, enter a judgment in favor of the Plaintiff and against Defendant for compensatory damages in the amount of two hundred and fifty thousand dollars ($250,000), punitive damages in the amount of two hundred and fifty thousand dollars ($250,000), plus both pre-judgment and post-judgment interest, the costs of this action, and for such other and further relief as this Court finds just and equitable;

C. For Count II, enter a judgment in favor of the Plaintiff and against Defendant for compensatory damages in the amount of two hundred and fifty thousand dollars ($250,000), punitive damages in the amount of two hundred and fifty thousand dollars ($250,000), plus both pre-judgment and post-judgment interest, the costs of this action, and for such other and further relief as this Court finds just and equitable;

D. For Count III, enter a judgment in favor of the Plaintiff and against Defendant for compensatory damages in an amount in excess of Fifty Thousand Dollars ($75,000), and for punitive damages in an amount in excess of Fifty Thousand Dollars ($75,000), plus both pre-judgment and post-judgment interest, the costs of this action, and for such other and further relief as this Court finds just and equitable;

E. For Count IV, enter a judgment in favor of the Plaintiff and against Defendant for compensatory damages in an amount in excess of Fifty Thousand Dollars ($75,000), and for punitive damages in an amount in excess of Fifty Thousand Dollars ($75,000), plus both pre-judgment and post-judgment interest, the costs of this action, and for such other and further relief as this Court finds just and equitable;

F. And for any or all Counts enter a judgment for preliminary and permanent injunction against Defendant and all persons acting under their control, from any and all activity that would cause the publication and republication of the false and defamatory statements, in any and all formats, including all electronic and physical media.

The Plaintiff hereby requests a trial by jury on all triable issues, pursuant to Fed. R. Civ. P. 38(b).

## V.       Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause        unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.       For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

I declare under penalty of perjury that the foregoing is true and correct.

Date of signing: 27 APRIL 2019

Signature of Plaintiff

Printed Name of Plaintiff

RICHARD  C. CARRIER

 **Amy Frank**
June 15 · ✅

Parents, and younger people who may graciously volunteer for Camp Quest, a summer camp for kids:

Richard Carrier, the man who sexually harassed me and touched me a year ago after speaking at ASU is now an official employee of this organization. Campus Quest and the Secular Student Alliance are partners, and fully aware of what transpired last year. I'm not even close to being his only victim, and there are even more victims of other speakers of the SSA.

Want to know why he continues to be involved after being banned from being an SSA speaker? He is dating the wife of the Executive Director of the Secular Student Alliance. This woman is the head of Camp Quest.

Corrupt people continue to destroy what could be wonderful organizations. I am officially BOYCOTTING the national Secular Student Alliance until their leadership is completely dismantled. Students deserve to have an organization capable of handling sexual harassment and assault, with no conflicts of interest. Not only is abuse fairly common at SSA events, but the organization itself goes out of their way to undermine the reports of its very own members' trauma.

I've held my tongue far too long. No more sweeping this shit under the rug. Time to own the fuck up and face the music. The victims have had enough.

If you've been a victim of harassment or assault at any SSA-sponsored event, please feel free to contact me. I will keep your name confidential.

#secularstudentalliance #sexualassault #sexualharassment #nomeansno #resign

**Plaintiff's Exhibit 1**



## Amy Frank Fund

**Share**    **Tweet**    ↗ 247 shares

Amy Frank is a neurobiology student at Arizona State University. Last year, she helped host a campus event, featuring Dr. Richard Carrier. Soon after the event, Amy reported that Dr. Carrier made several romantic and sexual advances toward her. In her own words.

"During the course of the night, Dr. Carrier brought up having sexual relations with my husband and I. He told me that he was disappointed that my husband wouldn't let me just have sex with him, but that'd he'd be willing to have my husband involved. My husband quickly fell asleep after arriving [at a friend's] house. Dr. Carrier kept whispering to me how my husband wasn't awake and wouldn't be for a while (insinuating that he wouldn't know if we did something inappropriate)...He repeatedly pointed out the fact that'd he had a vasectomy and how it much it increased his sexual performance.

**Plaintiff's Exhibit 2**

"Dr. Carrier made me feel very uncomfortable. He is very charming so he did not scare me at first, but he got increasingly creepy throughout the night. He is very obsessed with his sex life and has no problem sharing it with students, and trying to involve them in it. I would never feel okay going to another speaking event of his, or being in a private setting with him again. I think it would be unfair to his future female audiences to not say something about his actions. If something happened, I would feel partially at fault for not reporting his behavior."

In June of this year, Amy Frank decided to publicly break the silence regarding her experience of being sexually harassed. We could not be more proud of her for taking such a brave step and for being an example to women in the same situation.

Unfortunately, following her announcement, Amy learned she was facing a defamation lawsuit for coming forward with her story (view the letter here ). As her friends, we created this campaign to fund her legal defense against the man who harassed her and is now suing her.

It's important that we support women taking a stand against sexual harassment. It is equally important to stand in solidarity with women when they need our help.

We will be bringing a bagged lunch to work and donating the price of lunch ($10) to Amy's defense. We hope you will join us.

If you are unable to donate please share and post this campaign on all of your social media.

Amy should not have to be put under financial strain for voicing her experience. Every bit goes a long way.

Help spread the word!



↗ **247** shares on Facebook

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

DR. RICHARD CARRIER    :
           :
   Plaintiff,    :
           :   Case No. :
  -vs-      :
           :   JUDGE :
           :
AMY FRANK-SKIBA    :
           :   **AFFIDAVIT OF RICHARD CARRIER**
   Defendant   :   **CONCERNING AMY FRANK-SKIBA**
           :

> **Plaintiff's Exhibit 3**

---

## AFFIDAVIT OF DR. RICHARD CARRIER
## CONCERNING AMY FRANK-SKIBA

---

Dr. Richard Carrier, duly sworn, deposes and states on personal knowledge as follows:

1. Affiant states, I am over the age of eighteen (18) years, I have never been convicted of a crime involving fraud or dishonesty, and I am competent to testify as to all matters set forth herein.

2. Affiant states, in April 2015, I was the invited speaker at a meeting of the ASU affiliate of the SSA, where I first met Ms. Amy Frank-Skiba, now former president of that Arizona State University (ASU) chapter of the Secular Student Alliance (SSA).

3. Affiant states, following that SSA affiliate meeting, a large group of attendees, myself included, went to the Salut Kitchen Bar in Tempe, Arizona for an official event after-party. Affiant further states, Ms. Frank-Skiba was among the group.

4. Affiant states, I was soon introduced to Alex Toenniges, a woman who wanted to

1

discuss with me the subject of polyamory. Affiant further states, while at the Salut Kitchen Bar, I spent the bulk of my time in conversation with Ms. Toenniges.

5. Affiant states, later the same evening, after all official events were concluded, a small group of people, myself included, went to the Blasted Barley Beer Company in Tempe, Arizona. Affiant further states, Ms. Frank-Skiba was among the group, but I continued to spend the bulk of my time there in conversation with Ms. Toenniges, and I stayed until the bar closed very early the next morning, as did Ms. Frank-Skiba.

6. Affiant states, during all of this time, at both Salut and Blasted Barley, Ms. Frank-Skiba was accompanied by her husband, Phillip Skiba.

7. Affiant states, after that bar closed, a group of people, myself included, retired to the home of Mr. Forrest Schreick, who was providing me lodging for the night. Affiant further states, Ms. Frank-Skiba and her husband were among the group, as was Spencer Hawkins and Eric Moss.

8. Affiant states, for the next few hours, the group talked over drinks in Mr. Schreick's kitchen. Affiant further states, while I was drinking socially, I was not impaired.

9. Affiant states, Phillip Skiba became especially inebriated and passed out in Mr. Schreick's dining room. Affiant further states, from time to time, Ms. Frank-Skiba went to the dining room to check on her husband.

10. Affiant states, the group mingled intermittently in the back yard, kitchen, and in the dining room and living room, all adjacent and open to the kitchen area.

11. Affiant states, at one point I complimented Ms. Frank-Skiba on her efforts, as she coordinated the night's earlier speaking engagement and meeting of the ASU SSA.

Affiant further states, my comments were made openly, in front of multiple corroborating witnesses. Affiant further states, throughout the entire night and morning I neither approached nor touched Ms. Frank-Skiba at any point, nor whispered anything to her, but remained at a distance, as witnesses will attest.

12. Affiant states, during that pre-dawn gathering at Mr. Schreick's home, while in the kitchen and among the group, Eric Moss became physically affectionate and provocative with Ms. Frank-Skiba, in view of all present. Affiant further states, because Ms. Frank-Skiba's husband was asleep in the dining room, I was initially surprised to see this. Affiant further states, Ms. Frank-Skiba, however, smiled, appeared cheerful, and otherwise welcomed the attention.

13. Affiant states, I did not know either Ms. Frank-Skiba or Mr. Moss well enough to judge the appropriateness of their interaction. Affiant further states, I casually joked, in front of multiple witnesses, that I wished I were Mr. Moss, as in, allowed to touch her in such a way. Affiant further states, Ms. Frank-Skiba smiled and raised no objection, as all present will attest, and the incident was not otherwise notable.

14. Affiant states, I recall a group conversation in which the questions posed to me turned sexual in nature, though neither those questions nor my answers were vulgar or offensive. Affiant further states, I recall varied members in the group discussing alcohol's effect on their sexual performance. I commented on my experiences, and mentioned having undergone a vasectomy that resulted in better stamina during sex. Affiant further states, the foregoing remarks were all made openly, to men who were asking me about it, in front of multiple corroborating witnesses who can likewise

3

attest these remarks were not directed at Ms. Frank-Skiba.

15. Affiant further states, at all times material, and as all present will attest, Ms. Frank-Skiba continued to happily mingle and converse with the group, raising no objections to any conduct or topics of conversation.

16. Affiant states, a few hours before sunrise, I told everyone I was tired and needed to go to bed, and I went to the living room to fetch my charging mobile device; Spencer Hawkins was already sleeping on a couch there beside me at the time.

17. Affiant states, Ms. Frank-Skiba approached me there and initiated a discussion with me, expressing interest in an open marriage. Affiant further states, Ms. Frank-Skiba also indicated, however, that an open marriage was not a shared interest with her husband, who was still asleep in the dining room adjacent.

18. Affiant states, Ms. Frank-Skiba asked that our discussion be kept in confidence, noting that her husband routinely reads her private communications. Affiant further states, I expressed only sympathy and concern for her situation.

19. Affiant states, in concluding that short discussion, I remarked that I found Ms. Frank-Skiba interesting, and in polite and brief terms said to her that she could ask me out on a date anytime in future should her marital circumstances ever change. Affiant further states, Ms. Frank-Skiba smiled and said she would consider it; she expressed no disapproval to me; and I never pursued the matter further.

20. Affiant states, Ms. Frank-Skiba and I then said 'goodnight' to one another, after which I never saw or communicated with her again, nor had any knowledge of where she then went, other than that she was to collect her husband and return home; I went to

4

sleep in a guest room alone.

21. Affiant states, at no time whatsoever did I make physical contact with Ms. Frank-Skiba, nor cross any ordinary social boundary.

22. Affiant states, excepting for the one brief private conversation Ms. Frank-Skiba initiated with me immediately before leaving, which conversation was also friendly and mutual, for the entirety of the evening and morning all of my interactions with Ms. Frank-Skiba were at a group level, and at all times friendly and mutual.

23. Affiant states, I never sexually harassed, nor sexually assaulted Ms. Frank-Skiba, nor any other person, at any time whatever.

24. Affiant states, I had no other intimate communication with Ms. Frank-Skiba, neither before nor since the foregoing exchange.

25. Affiant states, in or around May 2015, I learned that a student complaint against me was filed with the SSA, alleging 'unwanted sexual advances' at a recent SSA event. Affiant further states, the SSA withheld the complainant's name, but according to the SSA's description of the complaint, and subsequent official and public rulings, it did not involve sexual assault, sexual harassment, or any of the alarming details Ms. Frank-Skiba would later publish. Affiant further states, I never would have guessed at the time that the complainant was Ms. Frank-Skiba.

26. Affiant states, I assumed the complaint was pursuant to a separate encounter, wherein I misjudged as flirtation a woman's polite conversation with me in a pub, and I awkwardly told her I'd like to make a pass at her. Affiant further states, that woman's discomfort was obvious and I immediately apologized, after which she and I

5

continued pleasant conversation for several more hours. Affiant further states that that woman never complained of my behavior, nor would it have then violated the SSA's sexual harassment policy.

27. Affiant states, I misremembered that separate event at a pub as an SSA event; it was only after I was defamed and had to assemble facts for a civil complaint that I realized it was not affiliated with the SSA and thus was not even subject to its policy.

28. Affiant states, it did not occur to me at the time that the sole complaint filed with the SSA would relate to Ms. Frank-Skiba, whom I didn't even ask out, but merely mentioned she could ask me out, if ever her situation changed, and only after she expressed interest to me in dating outside her marriage. And I had no other interactions with her I could even imagine a subject of complaint.

29. Affiant states, only in or around July 2015 did I first learn the SSA complainant was Ms. Frank-Skiba. Affiant further states, I was perplexed, as Ms. Frank-Skiba's report to the SSA in no way reflected what took place in April 2015; as Ms. Frank-Skiba had expressed no disapproval of any of my remarks at the time, and they were innocuous.

30. Affiant states, in or around August 2015, the Secular Student Alliance removed me from the organization's Speaker's Bureau for violation of its policy against fraternization, not for sexual harassment, a decision with which I agreed, as I would then no longer be subject to that fraternization policy, and the SSA informed me by email that I was welcome to continue arranging speaking engagements with them and any of their affiliates, just without the benefits awarded to members of the Bureau. Affiant further states, that according to their publicly stated policy SSA and SSA

6

affiliate speakers were not required to be members of the Bureau, and speakers who were not, were not governed by their fraternization policy.

31. Affiant states, in or around June 2016, a note to my Facebook® wall automatically generated without my knowledge a Facebook® life event, erroneously announcing I'd started work for Camp Quest, a non-profit organization that facilitates outdoor summer camps across the country for secular children ages eight (8) through seventeen (17), with an emphasis on science and critical thinking.

32. Affiant states, that Facebook® life event was inaccurate, as I was not employed by Camp Quest, and never had been, nor had any plans to be.

33. Affiant states, on June 15, 2016, Amy Frank-Skiba, apparently provoked by that erroneous announcement, published statements to Facebook® accusing me of sexual harassment and sexual assault in Arizona in April 2015, and also accused me of corruption involving Camp Quest and the SSA.

34. Affiant states, Ms. Frank-Skiba's statements were addressed to, in part, "Parents, and younger people who may graciously volunteer for Camp Quest, a summer camp for kids," implying I posed a danger to children.

35. Affiant states, Ms. Frank-Skiba's statements included the assertion about me that she was "not even close to being his only victim," implying personal knowledge that I had perpetrated similar acts on other women.

36. Affiant states, Ms. Frank-Skiba's statements included another assertion she knew to be false, that I had been "banned from being an SSA speaker."

37. Affiant states, that after directing my lawyer to send Ms. Frank-Skiba a desist letter,

7

Ms. Frank-Skiba instead reaffirmed her false statements and published additional

ones on July 30, in a post to raise money on GoFundMe®, making a number of claims

about my conduct that contradict her own original complaint to the SSA, and

contradict what every witness present will testify to; at which provocation I filed suit

against her and others for repeating these and making similar false allegations.

38. Affiant states, Ms. Frank-Skiba's accusations are categorically false, as multiple

witnesses will corroborate.

FURTHER AFFIANT SAYETH NAUGHT.

DR. RICHARD CARRIER

SWORN TO BEFORE ME and subscribed in my presence this 2d day of April

2019.

NOTARY PUBLIC

My commission expires:  Nov 4 2020

VINU PATEL
Notary Public, State of Ohio
My Comm. Expires Nov. 4, 2020

8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DR. RICHARD CARRIER | : | Case No. |
| Plaintiff | : | |
| | : | |
| -vs- | : | Judge: |
| | : | |
| THE ORBIT, *ET AL.* | : | **AFFIDAVIT OF** |
| | : | **SPENCER HAWKINS** |
| Defendants | : | |

Spencer Hawkins being first duly sworn, deposes and states on personal knowledge as follows:

1.  Affiant states, I am over the age of eighteen (18) years and I am competent to testify as to all matters set forth herein.

2.  Affiant states, I am currently a full time student.

3.  Affiant states, I have known Dr. Richard Carrier for approximately two (2) years.

4.  Affiant states, I have known Ms. Amy Frank-Skiba for approximately two (2) years.

5.  Affiant states, in April 2015, I attended an affiliate meeting of the Arizona State University (ASU) Secular Student Alliance (SSA), where Dr. Carrier was the invited speaker.

6.  Affiant states, following the SSA affiliate meeting, a large group of attendees, myself included, went to the Salut Kitchen Bar in Tempe, Arizona.  Affiant further states, Dr. Carrier and Ms. Frank-Skiba were among the group.

7.  Affiant states, later the same evening, I went to the Blasted Barley Beer Company in Tempe, Arizona.  Affiant further states, Dr. Carrier and Ms. Frank-Skiba were among

**Plaintiff's Exhibit 4**

the group. Affiant further states, I stayed until the bar closed for the night, as did Dr. Carrier and Ms. Frank-Skiba.

8. Affiant states, after the bar closed for the night, a group of people, myself included, retired to the home of Mr. Forrest Schreick, who hosted Dr. Carrier during his visit from California. Affiant further states, Ms. Frank-Skiba and her husband, Phillip Skiba, were among the group.

9. Affiant states, for the next couple of hours, the group talked over drinks in Mr. Schreick's kitchen.

10. Affiant states, Phillip Skiba became especially inebriated and passed out in Mr. Schreick's dining room. Affiant further states, from time to time, Ms. Frank-Skiba went to the dining room to check on her husband.

11. Affiant states, while at Mr. Schreick's home, the group mingled intermittently in the back yard, kitchen, and in the dining room and living room, both adjacent and open to the kitchen area.

12. Affiant states, I recall a group conversation that turned sexual in nature, though not vulgar or offensive. Affiant further states, I recall Dr. Carrier mentioned having undergone a vasectomy, commenting that he now enjoys better stamina during sex.

13. Affiant states, for much of the time, Ms. Frank-Skiba remained in the kitchen, socializing with the group. Affiant further states, for much of the time, Dr. Carrier sat at the end of a kitchen table, surrounded by other guests.

14. Affiant further states, near the end of the night, while in the kitchen and among the group, Mr. Eric Moss became physically affectionate and provocative with Ms. Frank-Skiba. Affiant further states, because Ms. Frank-Skiba's husband was asleep in

the dining room, I was initially surprised to see Mr. Moss touching her in a suggestive manner. Affiant further states, Ms. Frank-Skiba, however, smiled, appeared cheerful, and otherwise welcomed the attention.

15. Affiant states, at the end of the night, I retired to the living room, where I slept on a couch until morning.

16. Affiant states, I did not see any physical contact between Dr. Carrier and Ms. Frank-Skiba. Affiant further states, for the entirety of the evening, all of Dr. Carrier's and Ms. Frank-Skiba's interactions that I saw were at a group level, and at all times friendly and mutual.

17. Affiant states, I have no personal knowledge whatsoever that Dr. Carrier has ever sexually harassed or sexually assaulted another person, certainly not Ms. Frank-Skiba.

FURTHER AFFIANT SAYETH NAUGHT.

_____
SPENCER HAWKINS

SWORN TO BEFORE ME and subscribed in my presence this 12 day of August, 2016.

Cameron D. Clemente
Notary Public
Pima County, Arizona
My Comm. Expires 07-19-18

_____
NOTARY PUBLIC

My Commission Expires: 07/19/2018

3